**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* AUGUST BOGINA III, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 11 C 05373 |
| | ) | |
| MEDLINE INDUSTRIES, INC., | ) | Judge John J. Tharp, Jr. |
| TUTERA GROUP, INC., JOSEPH C. | ) | |
| TUTERA, WALNUT CREEK | ) | |
| MANAGEMENT COMPANY, L.L.C., | ) | |
| ILLINOIS HEALTH CARE | ) | |
| MANAGEMENT II L.L.C., and TUTERA | ) | |
| INVESTMENTS L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff August Bogina ("Bogina") brings this fourteen-count action, as relator on behalf

of the United States and eleven individual states, against defendant Medline Industries, Inc.

("Medline"), and defendants Tutera Group, Inc., Joseph C. Tutera, Walnut Creek Management

Company, L.L.C., Illinois Health Care Management II L.L.C., and Tutera Investments L.L.C.

(collectively, "Tutera"), pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31

U.S.C. §§ 3729 *et seq.*, and various parallel state statutes. *See* Third Amended Complaint

("Complaint" or "Compl."), Dkt. 27, ¶ 1.[1] Subject matter jurisdiction is alleged under 31 U.S.C.

§ 3732(a), (b), and 28 U.S.C. § 1331, *see* Compl., Dkt. 27, ¶ 9, but contested by Medline and

Tutera in the motions to dismiss now before the Court. *See* Dkt. 61, at 2; Dkt. 64, at 2.

---

[1] Counts I to III allege violations of the FCA, which claims are brought on behalf of the
United States, and Counts IV to XIV allege violations of similar state statutes of California,
Florida, Georgia, Illinois, Indiana, Louisiana, Michigan, North Carolina, Oklahoma, Tennessee,
and Texas, which claims are brought on behalf of those states. *See* Compl., Dkt. 27. The United
States and each of the individual states have declined to intervene. *See* Dkts. 14, 16.

Medline and Tutera move to dismiss Bogina's Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and/or 12(b)(6), contending that Bogina's claims "are jurisdictionally barred by the FCA's public disclosure bar," 31 U.S.C. § 3730(e)(4), because they "are based on and are substantially similar to allegations that were publicly disclosed" in another qui tam action against Medline previously brought and settled in this district, *United States ex rel. Mason v. Medline Indus., Inc.*, No. 07 C 5615 (filed Oct. 4, 2007; dismissed Mar. 24, 2011), as well as various news stories reporting on that litigation and settlement, and "because Bogina does not fall within the 'original source' exception to the public disclosure bar." *See* Medline Mot., Dkt. 64, ¶¶ 2-3; Tutera Mot., Dkt. 61, ¶ 2. For the following reasons, the Court agrees that Bogina's claims must be dismissed pursuant to the FCA's public disclosure bar.[2]

## I.     Governing Standards

Before turning to Bogina's claims and the events that preceded them, mention must be made of the standard and burden of proof applicable to the current motions. An amendment to the FCA which took effect on March 23, 2010, modifies its public disclosure bar, 31 U.S.C. § 3730(e)(4), from one depriving a court of jurisdiction (no court "shall have jurisdiction over an action under this section") to one requiring dismissal of a barred action or claim (the court "shall dismiss an action or claim under this section"). *See United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 705-06 (7th Cir. 2014) (quoting pre- and post-amendment versions of 31 U.S.C. § 3730(e)(4)). The Seventh Circuit has questioned whether

_____

[2] Alternatively, Medline and Tutera seek dismissal pursuant to Fed. R. Civ. P. 12(b)(6) for failure to allege a cognizable FCA violation, and Fed. R. Civ. P. 9(b) for failure to allege fraud with particularity, *see* Tutera Mot., Dkt. 61, ¶ 3; Medline Mot., Dkt. 64, ¶ 6; and Medline further moves to dismiss Bogina's claims as barred by res judicata based on the dismissal of, and pursuant to Fed. R. Civ. P. 12(c) as barred by the release Medline procured in, *Mason. Id.* at ¶ 5. Because the Court concludes that Bogina's claims must be dismissed under the FCA's public disclosure bar, the Court does not reach these additional issues.

this amended version of § 3730(e)(4) remains "a jurisdictional requirement that must be addressed before a court can reach the merits of the FCA claims," suggesting that the amended public disclosure bar perhaps may be addressed under Rule 12(b)(6) rather than Rule 12(b)(1). *See id.* ("it is no longer clear" that the Supreme Court's holding that § 3730(e)(4) "is a jurisdictional requirement" is "still good law" after the 2010 amendment) (citing *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467-70 (2007)).

Because this FCA amendment was not retroactive, the earlier version of § 3730(e)(4) applies to conduct before March 23, 2010, and the amended version to conduct thereafter.[3] Here, although the bulk of Bogina's Complaint alleges conduct that "began by at least December 1, 2003 and continued to at least December 31, 2009," two paragraphs allege (on "information and belief") that the "illegal conduct" "continues to the present day." Compl., Dkt. 27, ¶¶ 89, 135. Both versions of § 3730(e)(4)'s public disclosure bar are implicated in such a case—where the FCA violations alleged span the 2010 amendment of the statute[4]—conceivably requiring motions invoking that bar to be analyzed partly (here, primarily) under Rule 12(b)(1) and partly under Rule 12(b)(6). *See Chicago Transit Auth.*, 2014 WL 5333399, at *2. But that distinction makes no practical difference to the standard applied by the Court in this case. *See id.* ("Regardless of whether the 2010 version of the public disclosure bar is deemed substantive or jurisdictional, the Court's disposition of Defendant's motion is the same.").

---

[3] *Id.* at 706; *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 828 (7th Cir. 2013) (applying "the version that was in force when the events underlying this suit took place'" (quoting *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 934 (7th Cir. 2012)); *United States ex rel. Cause of Action v. Chicago Transit Auth.*, No. 12 CV 9673, 2014 WL 5333399, *2 n.2 (N.D. Ill. Oct. 20, 2014) ("the 1986 version applies to allegedly fraudulent reporting that occurred before March 23, 2010, and the 2010 version applies to fraudulent reporting that occurred thereafter" (citing *Leveski*)).

[4] *See, e.g.*, *Chicago Transit Auth.*, 2014 WL 5333399, at *2-6 (applying pre- and post-amendment versions of § 3730(e)(4)); *United States ex rel. Litwiller v. Omnicare, Inc.*, No. 1:11-cv-8980, 2014 WL 1458443, *7-8 and n.5 (N.D. Ill. Apr. 14, 2014) (same).

Like a motion under Rule 12(b)(6), a motion to dismiss under Rule 12(b)(1) mounting a "facial" challenge to subject matter jurisdiction (*i.e.*, based on the legal sufficiency of the jurisdictional allegations on the face of the complaint, as in this case) requires the complaint's allegations to be "taken as true for purposes of the motion." *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009); *Chicago Transit Auth.*, 2014 WL 5333399, at *3 (citing *Apex*); *Omnicare*, 2014 WL 1458443, at *3 (same). The burden of establishing jurisdiction in a *qui tam* case, however, remains on the relator plaintiff—here, Bogina—by a preponderance of the evidence. *Absher* 764 F.3d at 707 ("At each stage of the jurisdictional analysis, the relators bear the burden of proof," and such burden is to prove "on a claim-by-claim basis that subject matter jurisdiction exists by a preponderance of the evidence." (quoting *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009), and Boese, *Civil False Claims and* Qui Tam *Actions* § 4.02[A], at 4-56 (4th ed. Supp. 2014)) (brackets and internal quotation marks omitted). The Court applies these standards to the current motions.

## II. Background

### A. The *Mason* Litigation

According to Bogina's Complaint, "Medline is one of the largest manufacturers and distributors of durable medical equipment" in the United States, Compl., Dkt. 27, ¶ 76; and Medline sells such equipment to various healthcare providers, including nursing facilities, "the vast majority of which participate in federal healthcare programs such as Medicare and Medicaid." *Id.* at ¶ 77. Bogina alleges that Medline violated the FCA by using "rebates," "bribes," and "kickbacks" to induce nursing facilities to purchase Medline products, thereby causing such facilities in turn to submit false claims when seeking reimbursement for those purchases from government healthcare programs. *Id.* at ¶¶ 1-7.

4

Nearly four years before Bogina filed this case, however, another relator (Sean Mason) filed a strikingly similar action in this district against Medline and an affiliate for violations of the FCA and an Illinois whistleblower statute. *See* Medline Mem. Ex. A, Dkt. 65-1; Court Docket in *Mason v. Medline Indus., Inc.*, No. 07 C 5615 (N.D. Ill. filed October 4, 2007) [hereinafter *Mason*].[5] Although initially sealed while the federal government and Illinois considered whether to intervene (which they declined to do), the *Mason* action was unsealed in January 2009. *See Mason* Dkts. 13-18, 21. An amended complaint followed in March 2009, alleging that Medline violated the FCA and the foregoing Illinois statute by, among other "schemes," providing "rebates," "bribes," and "kickbacks" to induce purchases of Medline products by various healthcare providers, including nursing facilities, who in turn submitted false claims when seeking reimbursement for such purchases. Mason Dkt. 47, ¶¶ 2-10, 23, 27, 30.

Following dismissal of Mason's amended complaint for failure to plead fraud adequately and with particularity, *Mason* Dkt. 82, in December 2009, Mason filed a second amended complaint ("*Mason* Complaint"), omitting any state claims, but again alleging violations of the FCA through "rebates," "bribes," and "kickbacks" to various "health care providers who purchase medical and surgical supplies paid for by Federal healthcare programs such as Medicare and Medicaid," including among others, "nursing facilities." Medline Mot. Ex. B, Dkt. 65-2, ¶¶ 1-14, 26, 28. The *Mason* Complaint further identified the specific Medline department responsible for sales to nursing homes—its Healthcare Company sales department—and specific individuals in that department who had "knowledge of one or more fraudulent schemes alleged,"

---

[5] The Court may take judicial notice of public court records without converting a motion to dismiss into one for summary judgment. *Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012) ("Here, the court took judicial notice of the dates on which certain actions were taken or were required to be taken in the earlier state-court litigation—facts readily ascertainable from the public court record and not subject to reasonable dispute.").

including one in Medline's "Top management"—Medline Healthcare Company Senior VP

(Timothy Dunden) and VP (Steve Marciano). *Id.* at ¶¶ 28, 33. In denying Medline's motion to

dismiss the *Mason* Complaint, the *Mason* court described Mason's allegations of this "scheme"

as follows:

> The second amended complaint claims that Medline used a wide array of
> kickbacks and bribes to solicit business from healthcare providers.
> Providers are required to submit annual cost reports to the Centers for
> Medicare and Medicaid Services, the agency that administers federal
> healthcare programs. 42 C.F.R. 413.20(b). Each cost report includes a
> certification attesting to compliance with healthcare laws and regulations,
> including anti-kickback provisions. Mason claims that by engaging in
> bribes and kickbacks, Medline knowingly caused the submission of false
> or fraudulent claims for payment to the United States, and knowingly
> caused the use of false statements, resulting in the payment of false or
> fraudulent claims. 31 U.S.C. § 3729(a)(1) and (2).

*Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 733 (N.D. Ill. 2010).

More than a year after this ruling sustaining the *Mason* Complaint over Medline's motion

to dismiss, the *Mason* action was dismissed in March 2011 pursuant to a Settlement Agreement

between Mason, Medline, and the United States. *See* Mason Dkt. 238 (Mar. 24, 2011 "Order of

Dismissal with Prejudice" noting that "Mason, Medline, and the United States have entered into

a Settlement Agreement").[6] News media reports describing the claims that were asserted in

---

[6] Although not attached to Bogina's Complaint in this case, the *Mason* Settlement
Agreement is attached as an exhibit to both Medline's and Tutera's Memoranda, and both parties
ask the Court to take judicial notice of this document. *See* Medline Mem., Dkt. 65, at 14 and Ex.
D, Dkt. 65-4; Tutera Mem., Dkt. 62, at n.7 and Ex. C, Dkt. 62-3. Because the Settlement
Agreement's existence and content are "not subject to reasonable dispute" and are "capable of
accurate and ready determination through sources whose accuracy cannot be questioned"—
namely, the *Mason* court's Order of Dismissal acknowledging the fact of the Settlement
Agreement, Mason Dkt. 238, and the Agreement itself, the authenticity of which is undisputed—
it is subject to judicial notice without engendering summary judgment proceedings. *See
Ennenga*, 677 F.3d at 773-74. Moreover, Bogina does not oppose Medline's and Tutera's request
that the Court take judicial notice of the *Mason* Settlement Agreement, reinforcing the propriety
of doing so. *See Prestone Prods. Corp. v. South/Win, Ltd.*, No. 13 C 1853, 2013 WL 5164024,
*2 n.1 (N.D. Ill. Sept. 13, 2013) (taking judicial notice of settlement agreement that "was not
attached as an exhibit to the Complaint," where the parties did not dispute its authenticity or text)

*Mason* and the $85 million Medline paid to settle them quickly followed. *See*, *e.g.*, Medline Mot.

Ex. E, Dkt. 65-5 (B. Berkrot and J. Stempel, *Medline Settles Kickback Case for $85 Mln.*,

Reuters (Mar. 11, 2011), *available at* http://www.reuters.com/article/2011/03/12/medline-

kickback-settlement-idUSN1120850920110312: reporting *Mason* action name and docket

number, that "Mason contended" that "Medline offered the kickbacks to win new business," that

"some of these kickbacks were falsely labeled as 'rebates,'" and that Medline "will pay $85

million to settle," $23.4 million of which was to be paid to "the whistleblower, former Medline

employee, Sean Mason"); Medline Mot. Ex. F, Dkt. 65-6 (M. Kantzavelos, *Qui Tam Suit Against*

*Medline Settled for $85 Million*, Chicago Daily Law Bulletin, Vol. 157, No. 52 (Mar. 16, 2011):

reporting *Mason* action name and docket number; that Mason alleged that Medline "unlawfully

paid tens of millions of dollars in kickbacks and bribes to hundreds of health-care providers and

their purchasing officials in exchange for new or continued business"; that Mason "oversaw and

administered rebates paid to hospitals, skilled nursing facilities, hospices and other health-care

providers that entered into annual requirements contracts for the company's medical and surgical

products, according to the complaint"; that Medline "agreed to pay $85 million to the federal

government"; and that Mason "was awarded 27.5 percent of the settlement proceeds for his

whistleblower role in the case.").[7]

---

(citing cases). In so doing, however, the Court takes judicial notice of the *Mason* Settlement
Agreement only for the fact of the settlement and the claims it settled, and not for the truth of the
matters asserted therein. *Cf. Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074,
1081-82 and n.6 (7th Cir. 1997) (cautioning against judicial notice of settlements in other court
records "for the truth of the matters asserted" therein).

[7] Here again, Medline asks the Court to take judicial notice of these publications, Medline
Mem., Dkt. 65, at 14, and here again Bogina does not object. Indeed, Bogina's Complaint places
such items in issue by alleging that his "suit is not based upon prior public disclosure of
allegations or transactions . . . in news media." Compl., Dkt. 27, ¶ 12. Thus, because the
foregoing Reuters article, Medline Mot. Ex. E, Dkt. 65-5, and Chicago Daily Law Bulletin
article, Medline Mot. Ex. F, Dkt. 65-6, are "not subject to reasonable dispute" and are "capable

## B. Bogina's Claims in this Case

Nearly five months after the *Mason* action was dismissed, on August 9, 2011, Bogina filed this case. S*ee* Dkt. 1. Like the *Mason* Complaint publicly filed twenty months earlier, Bogina's original complaint here alleged a "scheme" by Medline using "rebates," "bribes," and "kickbacks" to induce healthcare providers—specifically, "nursing homes"—to make purchases from Medline, for which such customers in turn submitted false claims when seeking reimbursement from Medicare and Medicaid. *See*, *e.g.*, Dkt. 1, ¶¶ 1-12. Bogina's Complaint thus identified the same Medline "Healthcare Company" sales department responsible for sales to nursing homes that was identified in the *Mason* Complaint. *Id.* at ¶ 28; *Mason* Compl., Dkt. 65-2, ¶ 28. Bogina also alleged (in the very words used in the *Mason* Complaint) that "Medline employed a variety of schemes to induce the purchase of its products in violation of the AKS," Bogina Compl., Dkt. 1, ¶ 7; *Mason* Compl., Dkt. 65-2, ¶ 8; "[b]y paying kickbacks and bribes in violation of the AKS, Medline caused those Providers' certifications to be false," Dkt. 1, ¶ 11; Dkt. 65-2, ¶ 13; the recipients of such bribes and kickbacks "submitted thousands of cost

_____

of accurate and ready determination through sources whose accuracy cannot be questioned"—namely, verification of their publication by the news sources cited—they are also subject to judicial notice without engendering summary judgment proceedings. *Ennenga*, 677 F.3d at 773-74. *See also Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) ("We may take judicial notice of documents in the public record, including publicly reported stock prices, without converting a motion to dismiss into a motion for summary judgment."); *United States ex rel. Dingle v. Bioport Corp.*, 270 F. Supp. 2d 968, 973 (W.D. Mich. 2003) (published journal article "not subject to reasonable dispute" and therefore proper subject of judicial notice on motion under § 3730(e)(4)'s public disclosure bar). But again, the Court takes such judicial notice not for the truth of the matters asserted in these articles, *Gen. Elec.*, 128 F.3d at 1081-82, and only as to the publication of their contents, as other district courts have done on motions to dismiss under 31 U.S.C. § 3730(e)(4). *See*, *e.g.*, *United States ex rel. John v. Hastert*, No. 13 C 5014, 2015 WL 1006852, *9 (N.D. Ill. Mar. 4, 2015) (taking judicial notice of articles attached to motion to dismiss "to conclude that the information contained in [relator's] complaint has previously been publicly disclosed") (citing cases); *United States ex rel. Paulos, MD v. Stryker Corp.*, No. 11-0041-CV-W-ODS, 2013 WL 2666346, *3 (W.D. Mo. June 12, 2013) ("The Court can take judicial notice of the contents of these materials in order to ascertain whether they disclosed the allegations upon which this lawsuit is based."); *Dingle*, 270 F. Supp. 2d at 973 (same).

reports and interim claims to the federal government under federal healthcare programs to cover the cost of the goods, even though their cost reports falsely certified compliance with the AKS as a condition of payment," Dkt. 1, ¶ 5; Dkt. 65-2, ¶ 5; and "[a]s a result, all interim and final claims for payment submitted to federal healthcare programs by those Providers were tainted and rendered false in violation of the False Claims Act." Dkt. 1, ¶ 11; Dkt. 65-2, ¶ 13. A side-by-side comparison of the two complaints reveals even greater similarity:

| *Mason* **Complaint, Dkt. 65-2** **(Filed Dec. 8, 2009)** | **Bogina Complaint, Dkt. 1** **(Filed Aug. 9, 2011)** |
|---|---|
| 1. Relator brings this *qui tam* action to challenge **Defendants' widespread illegal kickback scheme targeting hospitals and other health care providers who purchase medical and surgical supplies paid for by Federal healthcare programs such as Medicare and Medicaid ("Providers").** Federal statutory and regulatory law forbids suppliers to pay any remuneration to induce purchasing by Providers, and prescribes that any claims submitted to the government that are tainted by such unlawful remuneration are not to be paid. | 1. Relator brings this *qui tam* action to challenge **Defendants' illegal kickback scheme specifically targeting nursing homes managed by the Tutera Group ("Providers") that purchase durable medical equipment and supplies ("DME") paid for by Federal healthcare programs such as Medicare and Medicaid.** Federal statutory and regulatory law forbids suppliers to pay any remuneration to induce purchasing by Providers, and prescribes that any claims submitted to the government that are tainted by such unlawful remuneration are not to be paid. |
| 5. *Medline is a seller of medical and surgical supplies and equipment ("med-surg supplies") that has unlawfully paid tens of millions of dollars in kickbacks and bribes* to hundreds of Providers and their purchasing officials in exchange for new or continued business. Providers receiving kickbacks have *in turn submitted thousands of cost reports and interim claims to the federal government under federal healthcare programs to cover the cost of the goods*, even though *their cost reports falsely certified compliance the AKS, a condition of payment.* | 5. *Medline is a seller of durable medical equipment and supplies ("DME") that has unlawfully paid millions of dollars in kickbacks and bribes* to Joseph Tutera, Walnut Creek, the Tutera Group and their purchasing officials in exchange for new or continued business. The Tutera Group nursing homes have *in turn, through information and belief, submitted thousands of cost reports and interim claims to the federal government under federal healthcare programs to cover the cost of the goods, even though their cost reports falsely certified compliance with the AKS as a condition of payment.* |

| | |
|---|---|
| 8. ***Medline employed a variety of schemes to induce Providers to purchase its products in violation of the AKS. Among other things, Medline (1) bribed purchasing officials and others who influenced Providers' purchasing decisions; (2) impermissibly paid "donations" to Providers and their related entities from Medline's charitable foundation; (3) paid kickbacks falsely labeled as "rebates" in various forms,*** including (a) "rebate" kickbacks without fixed terms or required documentation for federal auditors; (b) "prebate" kickbacks; (c) laundered "rebate" kickbacks; (d) credit "rebate" kickbacks; and (e) in-kind "rebate" kickbacks; and (4) made demand loans to Providers under a sham "consignment" program that Medline internally called "golden handcuffs." | 7. ***Medline employed a variety of schemes to induce the purchase of its products in violation of the AKS. Among other things, Medline paid large, upfront, cash sums to Joseph Tutera through his shell company, Walnut Creek, and paid kickbacks falsely labeled as "rebates" in various amounts to induce purchasing.*** Medline paid these kickbacks to a shell company, Walnut Creek Management Company, LLC ("Walnut Creek"), which was owned, operated and controlled by Joseph Tutera. Joseph Tutera allowed Walnut Creek, which was thinly capitalized, had few employees, no independent use of DME, and performed none of the DME patient services at the Tutera Group nursing homes, to retain millions of dollars in Medicare DME billings to which it was not legally entitled because the Tutera Group provided these services, not Walnut Creek. |
| 9. Regarding bribes to induce purchasing, Medline paid cash bribes to certain officials, recruited and hired officials or their family members for employment at Medline, and routinely "wined and dined" officials with gifts and expensive junkets. ***No safe harbor even remotely insulates such remuneration; when purchases are paid for with government funds all such attempts to influence a purchasing decision are unlawful. All of Medline's bribes violated the AKS and caused the recipient Providers to submit false claims for payment to government healthcare programs.*** | 7. ***No safe harbor even remotely insulates such remuneration; when purchases are paid for with government funds all such attempts to influence a purchasing decision are unlawful. All of Medline's bribes violated the AKS and, through information and belief, caused the recipient Providers to submit false claims for payment to government healthcare programs.*** |
| 13. As required by federal law, ***each of the Providers to which Medline paid unlawful bribes,*** donations, ***"rebate" kickbacks,*** and demand loans in the guise of "consignment payments" ***submitted annual Form 2552 cost reports containing an express certification of compliance with the AKS.*** | 11. As required by federal law, ***each of the Providers to which Medline paid unlawful bribes and "rebate" kickbacks submitted Form CMS 2540-96 cost reports containing an express certification of compliance with the AKS. By paying kickbacks and bribes in violation of the*** |

| | |
|---|---|
| *By paying kickbacks and bribes in violation of the AKS, Medline caused those Providers' certifications to be false. As a result, all interim and final claims for payment submitted to federal healthcare programs by those Providers were tainted and rendered false in violation of the False Claims Act.* | *AKS, Medline caused those Providers' certifications to be false. As a result, all interim and final claims for payment submitted to federal healthcare programs by those Providers were tainted and rendered false in violation of the False Claims Act.* |
| 14. The federal government, primarily through Medicare and Medicaid, pays for billions of dollars in medical supplies and services, including over one-third of the nation's annual costs for personal healthcare. *Medline knew the federal government would ultimately pay for a large portion of its med-surg products sold to Providers*. *Medline knew that its customer-Providers would seek payment from government health care programs through interim claims and cost reports.* Indeed, Medline's contracts with Providers expressly acknowledge that Providers would make claims for payment to the federal government. *Medline knew also that Providers were required to certify compliance with the AKS on cost reports as a condition of payment, and that its kickbacks would cause the cost reports to be false. As such, Medline is liable under the FCA for knowingly causing Providers to submit false certifications of compliance with the AKS and to submit false claims to get government funds paid or approved by the United States.* | 12. The federal government, primarily through Medicare and Medicaid, pays for billions of dollars in medical supplies and services, including over one-third of the nation's annual costs for personal healthcare. *Medline knew the federal government would ultimately pay for a large portion of its DME sold to Providers. Medline knew that the Tutera Group's nursing homes would seek payment from government health care programs through interim claims and cost reports. Medline knew also that the nursing homes were required to certify compliance with the AKS on cost reports as a condition of payment, and that its kickbacks would cause the cost reports to be false. As such, Medline is liable under the FCA for knowingly causing the Tutera Group to submit false certifications of compliance with the AKS and to submit false claims to get government funds paid or approved by the United States.* |
| 26. *Medline sells primarily to healthcare systems, hospitals, nursing facilities,* surgery centers, physician's offices and other healthcare providers, the vast majority of which participate in federal healthcare programs such as Medicare and Medicaid. | 26. *Medline sells primarily to healthcare systems, hospitals, nursing facilities,* surgery centers, physician's offices and other healthcare providers, the vast majority of which participate in federal healthcare programs such as Medicare and Medicaid. |
| 28. *The fraud alleged herein occurs in connection with Medline's sales.* Medline's sales activities are conducted primarily through its General Line sales department, | 28. *The fraud alleged herein occurs in connection with Medline's sales* through the Presidents of its National Accounts, Terry Hunt and Scott Sibigtroth. *The basis* |

| | |
|---|---|
| which has responsibility for all sales other than those to ***nursing homes, which are handled by Medline's smaller Healthcare Company sales department***. | ***for this Complaint is Medline's sales activities through Medline's Healthcare Company sales department.*** Medline has two main sales lines. Medline's primary sales are through its General Line sales department, which has responsibility for all sales other than those to nursing homes. ***Nursing homes are handled by Medline's smaller Healthcare Company sales department, which is the subject of this litigation.*** |
| 41. ***None of Medline's kickbacks met the constraints of the regulatory safe harbor (herein "Discount Requirements"). Specifically, all of Medline's kickbacks violated one or more of the safe-harbor's requirements that a payment*** (1) is an arms-length reduction in the amount a buyer was charged (§ 1001.952 (h)(5)); (2) with terms fixed at the time of the initial purchase ((h)(4)); (3) paid by check ((h)(5)(i)); (4) fully and accurately reported on the invoice or statement submitted to the buyer at the time of sale ((h)(2)(ii)(A, B)); (5) followed by documentation of the discount's calculation and the specific goods purchased to which it applied ((h)(2)(ii)(B)); and (6) with a calculation period that left the buyer unimpeded to comply with its obligations to earn the full payment within a single fiscal year, to fully and accurately report the discount to the government, and to do so for the year in which the payment was earned ((h)(2)(ii)(A, B); (h)(1)(ii)(A-C)). | 43. ***None of the kickbacks alleged herein met the constraints of the regulatory safe harbor (herein "Discount Requirements").*** S***pecifically, all of the kickbacks violated one or more of the safe-harbor's requirements that a payment*** (1) is an arms-length reduction in the amount a buyer was charged (§ 1001.952 (h)(5)); (2) with terms fixed at the time of the initial purchase ((h)(4)); (3) paid by check ((h)(5)(i)); (4) fully and accurately reported on the invoice or statement submitted to the buyer at the time of sale ((h)(2)(ii)(A, B)); (5) followed by documentation of the discount's calculation and the specific goods purchased to which it applied ((h)(2)(ii)(B)); and (6) with a calculation period that left the buyer unimpeded to comply with its obligations to earn the full payment within a single fiscal year, to fully and accurately report the discount to the government, and to do so for the year in which the payment was earned ((h)(2)(ii)(A, B); (h)(1)(ii)(A-C)). |
| 50. ***All of the kickbacks and bribes described herein violate the Anti-Kickback Statute. Each Provider-recipient of the kickbacks and/or bribes submitted annual Form 2552 cost reports to Medicare and Medicaid falsely certifying compliance with the AKS for the years in which purchasing the kickbacks and bribes were received,*** or in the case of demand loans, retained, ***thereby submitting false claims to*** | 47. ***All of the kickbacks and bribes described herein violate the Anti-Kickback Statute. Each Provider submitted CMS Form 2540-96 cost reports to Medicare and Medicaid falsely certifying compliance with the AKS for the years in which the kickbacks and bribes were received, thereby submitting false claims to the government in violation of the False Claims Act. The Providers' annual false*** |

| | |
|---|---|
| *the government in violation of the False Claims Act. The Providers' annual false certifications rendered false all interim claims for payment submitted by those Providers during those years, and rendered false the final billing and claim for payment submitted by those Providers in the Form 2552 for those years.* | *certifications rendered false all interim claims for payment submitted by those Providers during those years, and rendered false the final billing and claim for payment submitted by those Providers in the Form 2540-96 for those years.* |
| 52. *Medline's extensive program of bribery and kickbacks violated the letter and spirit of the AKS, and created the very dangers that the statute and regulations are intended to prevent: the government's potential payment of inflated prices for, and overutilization of, Medline products; possible injury to other suppliers that sought to compete with Medline in the marketplace without paying illegal inducements to Providers; and corruption of Providers' purchasing judgment, all of which are dangers identified by Congress and HHS-OIG and which flow from Medline's violations of the AKS.* Because it is a nationwide scheme involving many hundreds of Providers, it is not possible to detail every single instance of Medline's fraud in the four corners of Relators' qui tam Complaint. However, the paragraphs below provide illustrative, non-exhaustive examples of Medline's nationwide scheme. | 49. *Medline's extensive program of bribery and kickbacks violated the letter and spirit of the AKS, and created the very dangers that the statute and regulations are intended to prevent: the government's potential payment of inflated prices for, and overutilization of, Medline products; possible injury to other suppliers that sought to compete with Medline in the marketplace without paying illegal inducements to Providers; and corruption of Providers' purchasing judgment, all of which are dangers identified by Congress and HHS-OIG and which flow from Defendants' violations of the AKS.* |
| 53. *The AKS applies to those who pay Providers or individuals, or even simply offer to pay Providers or individuals, to induce or recommend purchases. The AKS's prohibition on "other remuneration . . . in cash or in kind" also prohibits gifts, which are remuneration in kind.* Medline bribed individuals who made or influenced purchasing decisions for Providers. Among other schemes, Medline paid cash to certain officials, recruited and hired them or their family members to work at Medline, and favored them with free junkets and expensive gifts. | 50. *The AKS applies to those who pay Providers or individuals, or even simply offer to pay Providers or individuals, to induce or recommend purchases. The AKS's prohibition on "other remuneration . . . in cash or in kind" also prohibits gifts, which are remuneration in kind.* Medline bribed Joseph Tutera through his shell company, Walnut Creek, because he controlled purchasing decisions for the Tutera Group. |

*See* Compl., Dkt. 1 (emphasis added); *Mason* Complaint, Dkt. 65-2 (emphasis added).

Bogina thus alleged the same "rebate," "bribe," and "kickback" violations of the FCA involving nursing homes that were alleged against Medline in *Mason*, *see* Medline Mem. Ex. B, Dkt. 65-2, ¶¶ 26, 28, 33; the only difference being that Bogina specifically named and joined the Tutera defendants, alleging them to be recipients of such unlawful remunerations in an "illegal kickback scheme specifically targeting nursing homes managed by the Tutera Group." Compl., Dkt. 1, ¶ 1. According to this complaint, Bogina learned of these violations "while working with Michael Tutera, a previous member of the ownership group of the Tutera Group and the brother of Defendant Joseph Tutera." *Id.* at ¶ 6. This complaint further alleged that Bogina "was a business associate of Michael Tutera from 1988 until Michael Tutera's untimely death in 2010," and as such, "Bogina was intimately familiar with the inner workings of the business arrangements of Defendants Walnut Creek, the Tutera Group and Joseph Tutera, and thereby gained personal knowledge of the timing, amount, and value of purchases by and inducements to Providers" described in the complaint. *Id.* at ¶ 19.

Bogina's original complaint remained sealed while the federal government determined whether to intervene, during which time Bogina twice amended it. *See* Dkt. 6 (filed Dec. 12, 2011); Dkt. 12 (filed Nov. 27, 2012). His first amendment added claims under similar statutes of six states, Dkt. 6, at 19-34; and the second added claims under similar statutes of five more states. Dkt. 12, at 35-40. The federal government and all eleven states declined intervention in November 2013, Dkts. 14 and 16; the case was unsealed thereafter, Dkt. 18; and Bogina amended yet again, filing his current Complaint on March 4, 2014. Dkt. 27. This iteration retains Bogina's FCA and state law claims, but adds a few bells and whistles, such as references to Medicare Parts A and B and the Defense Department's TRICARE program. *Id.* at ¶¶ 25-75. In

addition, the current Complaint alleges that "Bogina was Michael Tutera's close confidant," that Michael Tutera described to Bogina "the illegal inducement scheme between Medline and the Tutera Defendants and provided [Bogina] with documentation related to the scheme," and that after Michael Tutera's death, Bogina obtained from his widow "certain Electronically Stored Information," which also included documentation pertaining to the alleged scheme, some of which is referenced in, and attached as Exhibits to, the Complaint. *Id*. at ¶¶ 90-91, 106, 129.

Thus attempting to demonstrate his bases to bring his claims against Medline and Tutera, Bogina's current Complaint states the following: "All allegations herein regarding kickbacks and bribes are based on information learned first-hand by Relator Bogina, and/or communications Relator Bogina engaged in and/or witnessed (including the documentation and ESI provided to Bogina by Michael Tutera and his widow), as supplemented by the results of his attorneys' investigation." *Id.* at ¶ 91. Medline and Tutera maintain that these assertions fail to substantiate Bogina as an "original source" of the information on which his allegations are based, allegations which they contend were disclosed in *Mason*. *See* Dkts. 61, 64. The Court agrees.

## III.    Analysis

The FCA's *qui tam* provisions allow a relator to sue on behalf of the United States and "collect a bounty" from any recovery or settlement. *Goldberg*, 680 F.3d at 934. Not surprisingly, the lucrative potential of such awards—potentially between 15 and 25 percent if the government proceeds with the case, and between 25 and 30 percent if the government declines to do so (as here), 31 U.S.C. § 3730(d)—created a "risk that unnecessary 'me too' private litigation would divert funds from the Treasury." *Goldberg*, 680 F.3d at 934. This led Congress to implement the FCA's public disclosure bar. *Id.* This provision, codified in 31 U.S.C. § 3730(e)(4), "seeks to prevent parasitic lawsuits by 'opportunistic plaintiffs who have no significant information to

contribute of their own.'" *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 690 (7th Cir. 2014) (quoting *Graham Cnty. Soil and Water Conserv. Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 (2010)). It does so by barring suits brought by relators "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed," unless "the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A).[8] An "original source" (for purposes of this case) is an individual "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," 31 U.S.C. § 3730(e)(4)(B), or in the words of the 1986 version, "an individual who has direct and independent knowledge of the information on which the allegations are based." *See Leveski*, 719 F.3d at 826 (quoting pre-amendment version of § 3730(e)(4)(B)).

The FCA's public disclosure bar thus strikes a balance "between two competing policy goals: blocking opportunistic lawsuits filed by plaintiffs seeking to capitalize on information already in the public domain and encouraging lawsuits by relators who have firsthand knowledge of fraud against the government." *Glaser*, 570 F.3d at 910. Determining whether the bar applies requires a court to consider first whether the relator's allegations are "substantially similar to publicly disclosed allegations." *Leveski*, 719 F.3d at 829. If so, the court must next assess whether the relator has "direct and independent knowledge of the information on which [his] allegations are based." *Id.* After conducting this inquiry here, the Court concludes that the FCA's public disclosure bar requires dismissal of Bogina's Complaint.

---

[8] The pre-amendment version of this provision (effective before March 23, 2010), which is chiefly applicable here, applies to actions "***based upon*** the public disclosure of allegations or transactions," unless brought by an original source. *See Leveski*, 719 F.3d at 826 (quoting pre-amendment version of §3730(e)(4) (emphasis added)). But the Seventh Circuit has clarified that this change in language (from "based upon" to "substantially the same" as) has no substantive impact, since the Seventh Circuit (and most other circuits) had already construed the pre-amendment version to incorporate the "substantially similar" standard now codified in the provision. *See id.* at 828 and n.1.

## A. Bogina's Allegations are Substantially Similar to Allegations and Transactions Publicly Disclosed in *Mason*.

There can be no serious dispute that at least some of Bogina's allegations in this case are "substantially similar" to those in the *Mason* Complaint publicly filed nearly two years earlier. As shown above, many of the allegations in the *Mason* Complaint are virtually identical to those in Bogina's first complaint here. *Compare* Dkt. 1, ¶¶ 1-12, 26-50, *with* Medline Mem. Ex. B, Dkt. 65-2, ¶¶ 1-14, 26-53. Nor does Bogina dispute that the *Mason* Complaint was a public disclosure within the meaning of 31 U.S.C. § 3730(e)(4).[9] Instead, Bogina attempts to trivialize the *Mason* allegations he parroted in this case as mere background describing a "kickbacks arrangement between Medline and other entities" and "basic facts about Medline and the Federal programs at issue." Bogina Mem., Dkt. 85, at 16. But they are much more.

Like Bogina's Complaint, the *Mason* Complaint publicly disclosed allegations of fraud outright, and not just any fraud—fraud by Medline in violation of the FCA through the payment of "bribes," "rebates," "kickbacks," and other "remunerations" to "Providers and their related entities," as well as "purchasing officials and others who influenced Providers' purchasing decisions," to induce purchases from Medline, for which such providers would in turn submit false claims when seeking reimbursement from Medicare and Medicaid. Medline Mem. Ex. B, Dkt. 65-2, ¶¶ 1-14, 26-53. So does Bogina. Compl., Dkt. 27, ¶¶ 2, 6-7, 89. Indeed, zeroing in on

---

[9] Both the pre- and post-amendment versions of § 3730(e)(4) apply to disclosures in a civil hearing, although the amended version requires a "Federal . . . civil . . . hearing in which the government or its agent is a party." *See* 31 U.S.C. § 3730(e)(4); *Absher*, 764 F.3d at 706 (quoting pre-amendment version). It is well settled that a federal lawsuit constitutes a "civil hearing" for purposes of § 3730(e)(4). *See, e.g.*, *Schultz v. Devry Inc.*, No. 07 C 5425, 2009 WL 562286, *2 (N.D. Ill. Mar. 4, 2009) (prior federal lawsuits were § 3730(e)(4) public disclosures); *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 235 (3d Cir. 2013) (prior litigation publicly disclosed information in summary judgment submission, since "the public disclosure bar precludes *qui tam* suits based on a complaint filed with the court and available to the public") (citing *United States ex rel. Paranich, D.C. v. Sorgnard*, 396 F.3d 326, 334 (3d Cir. 2005)). And *Mason* was certainly a federal lawsuit "in which the government or its agent [was] a party."

the fraud Bogina alleges here, the *Mason* Complaint alleged specifically that Medline sold its products to "nursing homes" among other providers, Medline Mem. Ex. B, Dkt. 65-2, at ¶¶ 26, 28; the specific Medline department responsible for sales "to nursing homes" (its Healthcare Company sales department), *id.* at ¶ 28, and that Medline's fraudulent scheme involved that specific department. *Id.* at ¶ 33. That is precisely what Bogina alleges in this case—he even names the same Medline sales department. Compl., Dkt. 27, ¶¶ 2, 77-78, 89. "If an allegation of fraud has already been made, the analysis is straightforward." *Absher*, 764 F.3d at 708. And so it is here. Because the fraudulent scheme over which Bogina sues was publicly disclosed in *Mason* long before Bogina filed this case, the FCA's public disclosure bar is implicated.

Struggling to avoid this result, Bogina argues that the *Mason* Complaint's allegations "are not the 'allegations or transactions' at issue in this case" because "critical, dispositive information concerning details of *this* fraud scheme and *who committed the fraud* was never publicly disclosed" in *Mason*. Bogina Mem., Dkt. 85, at 16-17 (emphasis in original). Right out of the starting blocks, this argument runs head first into the *Mason* Complaint's implication of both Medline's nursing home customers and the Medline sales group that serviced them. *See* Medline Mem. Ex. B, Dkt. 65-2, at ¶¶ 26, 28, 33. That covers this case pretty thoroughly. *See* Compl., Dkt. 27, ¶¶ 2, 77-78, 89. But for other reasons still, the argument fails.

As to Bogina's claim that he adds "details" to flesh out the story, the Seventh Circuit has repeatedly observed that "a private suit is 'based upon' a public disclosure," and therefore barred under § 3730(e)(4), "when the allegations are 'substantially similar,' ***even if the private relator adds details***." *Goldberg*, 680 F.3d 934 (quoting *Glaser*, 570 F.3d at 920) (emphasis added); *see also United States ex rel. Gear v. Emergency Med. Assoc. of Ill., Inc.*, 436 F.3d 726, 729 (7th Cir. 2006) ("Public disclosure occurs when 'critical elements exposing the transaction as

fraudulent are placed in the public domain.'" (quoting *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003)). Bogina's "detailed, fact-based allegations," Bogina Mem., Dkt. 85, at 19, do not circumvent these holdings. Nor does his assertion of additional statutory bases for liability which Bogina claims are not precluded by the *Mason* Settlement Agreement (state-funded Medicaid, Medicare Part B, and TRICARE, *id.* at 24-26). *See United States ex rel. Garbe v. Kmart Corp.*, 968 F. Supp. 2d 978, 989 (S.D. Ill. 2013) ("for public disclosure to exist, the allegations need not mirror each other"; thus, "FERA, TriCare and Reverse FCA claims" were "simply iterations of the single underlying claim that [relator] alleged from the start" and therefore publicly disclosed in his original allegations). What matters to the public disclosure inquiry is not the legal basis of liability but the factual allegations on which liability would be based. *See United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 572 (10th Cir. 1995) ("Section 3730(e)(4)(A) merely requires the public disclosure of 'allegations or transactions' upon which the *qui tam* action is based. It does not require that the allegations have the same statutory basis."); *Dingle*, 270 F. Supp. 2d at 979 ("It is irrelevant to this inquiry whether Plaintiffs' allegations and those gleaned from the public disclosure have the same statutory bases."), *aff'd*, 388 F.3d 209 (6th Cir. 2004).

Similarly insufficient are "the documents and information" Bogina obtained from his late business associate's widow, on which Bogina insists his claims are based, rather than the public disclosure in *Mason*. *See* Bogina Mem., Dkt. 85, at 19. For one thing, Bogina's contention that his complaints in this case were not based upon the *Mason* Complaint, *id.*, is more than difficult to credit, given he that quoted so liberally from it—and not merely boilerplate (though that too). *Compare*, Dkt. 1, ¶¶ 1-12, 26-50, *with* Medline Mem. Ex. B, Dkt. 65-2, 1-14, 26-53. As in *Gear*, such a "self-serving" contention "is insufficient to sustain a claim that [Bogina's] allegations are

not based on public information," given "the weighty public record, which it is difficult to believe [Bogina] did not notice." *See Gear*, 436 F.3d at 729 (relator's "self-serving affidavit" claiming that relator "based his complaint on 'personal observations and experience'" was "insufficient to sustain a claim that his allegations [were] not based on public information").

In any event, as noted above, section 3730(e)(4)'s "based upon" requirement means only "substantially similar to," *see supra* note 8, not whether the relator plans to cite different evidence. And as the Seventh Circuit explained in *Glaser*, "'based upon does not mean 'solely based upon.'" *Glaser*, 570 F.3d at 920-21. Thus, "an FCA *qui tam* action even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transactions. Congress chose not to insert the adverb 'solely', and we cannot, because to do so would dramatically alter the statute's plain meaning.'" *Id.* (brackets omitted, quoting *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir. 1992)); *Zizic*, 728 F.3d at 238 ("the public disclosure bar covers actions simply 'based upon' public disclosures, including actions 'even partly based upon' such allegations or transactions" (quoting *Glaser*)).

As to Bogina's second point—that *Mason* never disclosed "the *particular providers* identified by Relator Bogina," Bogina Mem., Dkt. 85, at 19—that, too, was rejected by the Seventh Circuit in *Gear*: "Gear contends . . . that these public disclosures do not expose any transactions from which the government (or anyone else) could infer that the particular entities he has named were fraudulently billing Medicare. We are unpersuaded by an argument that for there to be public disclosure, the specific defendants named in the lawsuit must have been identified in the public records." *Gear*, 436 F.3d at 729. Several courts have followed *Gear* in reaching the same conclusion. *See*, *e.g.*, *Zizic*, 728 F.3d at 238 (citing *Gear* in concluding that relator's claims were publicly disclosed in earlier litigation, even though the particular

defendants relator sued "were not actually identified" in that earlier case); *Schultz*, 2009 WL 562286, at *3 ("The specific defendants named in the lawsuit do not need to be identified in public disclosures." (citing *Gear*)), *cited with approval in Leveski*, 719 F.3d at 834; *In re Nat. Gas royalties Qui Tam Litigation*, 467 F. Supp. 2d 1117, 1138 (D. Wyo. 2006) ("the issue is not whether a public disclosure names names" (citing *Gear*)).

Central to these holdings was the prior public disclosure's fulfillment of the FCA's primary purpose—to place the government "in a position to vindicate society's interests." *Gear*, 436 F.3d at 729 (quoting *Feingold*, 324 F.3d at 495); *Zizic*, 728 F.3d at 238 (although defendants "were not actually identified in the [earlier] litigation, they were directly identifiable from that public disclosure"); *Schultz*, 2009 WL 562286, at *3 ("The critical elements exposing DeVry's alleged fraud were publicly disclosed in parallel litigation and news reports."); *In re Natural Gas*, 467 F. Supp. 2d at 1138 ("the issue is whether, once alerted by the public disclosure to the nature of the wrongdoing, the federal government can identify the wrongdoers through whatever means are at its disposal" (citing *Gear*)). "The public disclosure bar is designed to prevent lawsuits by private citizens in such situations because 'where a public disclosure has occurred, that authority is already in a position to vindicate society's interests, and a *qui tam* action would serve no purpose.'" *Glaser*, 570 F.3d at 913 (quoting *Feingold*, 324 F.3d at 395). That is certainly true here, where the federal government was fully apprised in *Mason* long before Bogina filed this case both of Medline's fraud and that Medline perpetrated such fraud with its health care provider customers, ***including nursing homes***, along with such customers' "related entities," "purchasing officials," and "others who influenced [their] purchasing decisions." *See* Medline Ex. B (*Mason* Compl.), Dkt. 65-2, ¶ 1-14, 26-28, 33, 42. In other words, with a group including the Tutera defendants.

That nursing homes (and thus the Tutera defendants) were included within the fraud alleged in *Mason* is no leap, since the *Mason* Complaint alleged nursing facilities among Medline's primary customers, *id.* at ¶ 26, that Medline's fraudulent scheme "occurs in connection with Medline's sales," *id.* at ¶ 28, and that the scheme was so pervasive within the company that "Medline internally accounted for the bribes and kickbacks as a cost of getting and doing business." *Id.* at ¶ 43. Even the media took notice of the *Mason* Complaint's allegations of Medline's fraud with its nursing home customers. *See* Medline Mot. Ex. F, Dkt. 65-6 (Kantzavelos *supra* (Chicago Daily Law Bulletin article) reporting on the *Mason* Complaint's allegations of "an illegal kickback scheme targeting health-care providers that purchase products paid for by federal programs," and "rebates paid to hospitals, skilled nursing facilities, hospices and other health-care providers"). But the *Mason* Complaint's allegations involving nursing homes were even more specific. The government was also apprised (1) that this fraud involved the Medline department that handled Medline's nursing home customers, and (2) of the management personnel in that department who knew about it, including its VP and Senior VP. *Id.* at ¶¶ 26, 28, 33. And there can be no doubt that these allegations positioned the government "to vindicate society's interests" regarding this scheme, *Glaser*, 570 F.3d at 913, because Medline's alleged scheme pertaining to nursing homes was referenced explicitly in the *Mason* Settlement Agreement, to which the United States was a party. Medline Mem. Ex. D, Dkt. 65-4.

The *Mason* Settlement Agreement required Medline to pay $85 million to settle claims for the "Covered Conduct" defined in the Settlement Agreement, which expressly included claims involving "Skilled Nursing" Facilities and their submission of "annual cost report(s), such as Forms . . . 2540," just like those referenced repeatedly throughout Bogina's Complaint. *See* Medline Mem. Ex. D, Dkt. 65-4, at 3; Compl., Dkt. 27, ¶¶ 6, 32, 38, 40, 49 (referring to "annual

costs reports, Form CMS 2540-96," and "similar forms"). Although this definition of "Covered Conduct" is not part of *Mason*'s public court docket (the *Mason* court's Order of Dismissal referred to the Settlement Agreement, but did not attach it, *see* Medline Mem. Ex. C, Dkt. 65-3), the Settlement Agreement's specific reference to this conduct demonstrates nonetheless that Mason's public disclosure positioned the government "to vindicate society's interests" regarding the very claims Bogina makes here. *See Gear*, 436 F.3d at 729.[10] Nor does Bogina dispute that the *Mason* Settlement Agreement covers the same fraudulent scheme he alleges against Medline in this case, excepting his newly asserted statutory grounds (state-funded Medicaid, Medicare Part B, and TRICARE). Bogina Mem., Dkt. 85, at 24-26. But again, the statutory bases for Bogina's claims are beside the point. *See Sandia*, 70 F.3d at 572; *Garbe*, 968 F. Supp. 2d at 989; *Dingle*, 270 F. Supp. 2d at 979. What matters is, the *Mason* Complaint publicly alleged the same fraudulent scheme Bogina alleges against Medline in this case sufficiently to enable the

―――――――――――

[10] Because the *Mason* Complaint so clearly disclosed the same fraud alleged by Bogina in this case—referring explicitly to Medline's sales to nursing facilities, the Medline department that handled such sales, and the managerial personnel within that department who had knowledge of the fraud committed in connection with such sales, Dkt. 65-2, ¶¶ 26, 28, 33—it is unnecessary to rely on the *Mason* Settlement Agreement's definition of "Covered Conduct" as a § 3730(e)(4) "public disclosure" (though it would appear to qualify as such based on current Seventh Circuit authority). *See, e.g., Glaser*, 970 F.3d at 913-14 (acknowledging that disclosure to a "competent public official . . . who has managerial responsibility for the very claims being made" is a § 3730(e)(4) public disclosure (quoting *United States v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999), *overruled on other grounds by Glaser*, 570 F.3d at 920)); *Chicago Transit Auth.*, 2014 WL 5333399, at * 6 ("disclosure to a public official with direct responsibility for the allegations at issue qualifies under" § 3730(e)(4)) (citing *Farmington*, 166 F.3d at 861); *Omnicare*, 2014 WL 1458443, at *7 (same); *but see United States v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, -- F.3d --, 2015 WL 774887, *5-6 (6th Cir. Feb. 25, 2015) (disagreeing with Seventh Circuit authority that "disclosure of an alleged false claim to a competent public official who has managerial responsibility for that very claim" is a § 3730(e)(4) public disclosure) (citing cases). Rather, as explained above, the Court notes the *Mason* Settlement Agreement's reference to Medline's alleged fraud involving nursing homes only as an indication that the *Mason* Complaint's public disclosure of such fraud plainly positioned the government to act upon it, because the government did, in fact, do so. *See Glaser*, 970 F.3d at 914 ("the appropriate entity responsible for investigating claims of Medicare abuse had knowledge of possible improprieties . . . and was actively investigating those allegations and recovering funds").

government to settle and extract payment for it, as even Bogina concedes. *See* Bogina Mem., Dkt. 85, at 22. That the government's release under the *Mason* Settlement Agreement may leave room for other statutory claims or claims against other parties (such as Tutera) does not diminish the fact that the scheme alleged here is the same.[11]

Attempting to fend off this conclusion, Bogina invokes the Seventh Circuit's holding in *United States ex rel. Baltazar v. Warden*, 635 F. 3d 866, 868 (7th Cir. 2011), that "reports documenting a significant rate of false claims by an industry as a whole—without attributing fraud to particular firms—do not prevent a *qui tam* suit against any particular member of that industry." *See* Bogina Mem., Dkt. 85, at 18. But key to the Seventh Circuit's holding in *Baltazar* was the failure of the published reports at issue to identify **any** fraud, let alone the fraud alleged by the relator Baltazar, or **any** "particular firms," let alone the defendants he sued. *See Baltazar*, 635 F.3d at 867-68 (governmental reports "of unwarranted claims by health care providers" did not necessarily indicate fraud, since "the errors may have been caused by negligence rather than fraud (which means intentional deceit)": "As far as we can tell, no court of appeals supports the

---

[11] In a related vein, Bogina asserts that the *Mason* Settlement Agreement also leaves room for "all false claims beyond May 31, 2010" (the end-date covered by the *Mason* Settlement Agreement), Bogina Mem., Dkt. 85, at 11, forgetting that Bogina himself has failed to identify any wrongdoing after this date, except two paragraphs alleging on "information and belief" that the earlier "illegal conduct" alleged "continues to the present day." Compl., Dkt. 27, ¶¶ 89, 135. Putting aside the myriad issues raised by this device regarding whether Bogina adequately alleges an FCA claim for this later timeframe or alleges fraud with the specificity required by Fed. R. Civ. P. 9(b), the lack of "specific allegations of any wrongdoing" during this timeframe further fails to distinguish Bogina's Complaint from the public disclosure in the *Mason* Complaint, which included the timeframe covered by Bogina's specific allegations here—2003-2009. *See* Dkt. 27 at ¶ 89; Medline Mem. Ex. B, Dkt. 65-2, ¶¶ 216, 220-498 (alleging illegal conduct from 2001-2009); *see also Bannon v. Edgewater Med. Ctr.*, 406 F. Supp. 2d 907, 922 (N.D. Ill. 2005) (*qui tam* complaint's allegations on information and belief of timeframe broader than public disclosure was no basis to conclude that complaint was not "based upon" public disclosure: "While there are allegations made on information and belief that the fraud began in 1994, two years before the . . . article . . . there is no elaboration of the basis for the claim, and there is no specific allegation of any wrongdoing in 1994. Even the selection of 1994 as the starting date of the fraud appears to be an inference derived from the disclosures in the article").

view that a report documenting widespread false claims, but not attributing them to anyone in particular, blocks *qui tam* litigation against every member of the entire industry.").

Here, by contrast, the prior public disclosure was not merely a governmental report "that false or mistaken claims are common," *id.* at 869; it was a complaint in a lawsuit expressly alleging fraud by Medline in its dealings with customers, including nursing homes, and that such fraud was standard operating procedure for the company. *See, e.g.*, *Mason* Compl., Dkt. 65-2, ¶ 1 (Medline engaged in a "widespread illegal kickback scheme"); ¶¶ 5, 52 (bribes and kickbacks paid "to hundreds of Providers and their purchasing officials"); ¶ 6 (Medline "broadly [and] systematically" violated the AKS and FCA; its "primary sales strategy was to 'buy business' by offering various inducements to Providers"). Unlike the prior disclosures in *Baltazar*, which provided no reason to believe that any particular entity was engaging in any fraudulent conduct, the public disclosure here—the *Mason* Complaint—alleged that the fraudulent practices it described were a normal, if not universal, feature of Medline's relationships with its customers.

Indeed, the *Baltazar* court distinguished the generalized and inconclusive prior disclosures in that case from the prior disclosures it had confronted in *Gear* on precisely that basis. *See Baltazar*, 635 F.3d at 869 (prior disclosure in *Gear* indicated that "the practice it described was normal, if not universal, among teaching hospitals"). As in *Gear*, the prior disclosure here, the *Mason* Complaint, revealed a uniform practice by Medline with its customers, including nursing homes, and thus implicated Medline's nursing home clients across the board. *See* Medline Mem. Ex. B, Dkt. 65-2, *e.g.*, ¶¶ 1-14, 26, 28, 33, 43, 52-53. Moreover, unlike the disclosure at issue in *Baltazar*, the *Mason* Complaint, which was sustained on a motion to dismiss under Fed. R. Civ. P. 9(b), *Mason*, 731 F. Supp. 2d at 733, alleged a particular fraud, identified the same Medline department that Bogina identifies here (Medline's Healthcare

Company sales department), and described the same means of perpetrating that fraud as Bogina alleges—"rebates," "bribes," and "kickbacks" given to customers, including nursing homes, their "related entities," and others who influenced [their] purchasing decisions." *See* Medline Mem. Ex. B, Dkt. 65-2, *e.g.*, ¶¶ 1-14, 26, 28, 33, 43, 52-53; Dkt. 1 ¶¶ 1-12, 26-50; Compl., Dkt. 27, ¶¶ 77-78, 89. Identifying one such group of nursing facilities and their related entities, Dkt. 27, ¶ 89, told the government nothing it did not already know or could not readily discover. The *Baltazar* court made clear that its holding would not apply to such a *qui tam* complaint that was "substantially similar" to earlier published information, *Baltazar*, 635 F.3d at 869; and *Mason* was "substantially similar" to this case, at the very least. This Court therefore concludes, as did the court in *Zizic*, that this case "is closer to *Gear* than to *Baltazar*." *Zizic*, 728 F.3d at 238.[12]

Finally, Bogina points to other Seventh Circuit decisions warning district courts against "viewing FCA claims 'at the highest level of generality . . . in order to wipe out *qui tam* suits that rest on genuinely new and material information.'" Bogina Mem., Dkt. 85, at 17 (quoting *Leveski*, 719 F.3d at 831 (quoting *Goldberg*, 680 F.3d at 936)). This Court is mindful that the Seventh

_____

[12] Bogina also relies on a statute of limitations analogy posited by the *Baltazar* court, Bogina Mem., Dkt. 85, at 18, but that, too, works against him. Here, unlike *Baltazar*, the information provided in the *Mason* Complaint would likely start the statute of limitations running on a claim by the government. Under § 3731(b)(2), the government may not bring a claim "more than 3 years after the date when facts material to the right of action are known or reasonably should have been known . . . ." Having disclosed that Medline's relationships with its customers, including nursing homes, were routinely characterized by the payment of bribes and kickbacks, and that senior executives in the division that managed Medline's relationships with its nursing home customers were among those who had knowledge of those unlawful practices, Dkt. 65-2, ¶¶ 1-14, 26-53, the *Mason* Complaint clearly provided the government with "facts material to the right of action" that Bogina alleges here. But even more importantly, as the *Baltazar* court further acknowledged, the animating principles behind the FCA's public disclosure bar are distinct from those behind a statute of limitations; they are to allow new claims that provide the government information it lacks and needs to pursue an action, but bar "parasitic" claims based upon public information that already put the government in a position to investigate and pursue the claim itself if it wishes to do so. *See Baltazar*, 635 F.3d at 868-69. The *Mason* Complaint did the former; Bogina's Complaint is the latter.

Circuit has cautioned that such "boosting" of "the level of generality" of an FCA claim in order to find a prior public disclosure of that claim "is not sound," *e.g.*, *Goldberg*, 680 F.3d at 935, and the Court has considered that concern carefully. In this case, however, the admonishment is more aptly applied to Bogina's arguments rather than to those of the defendants. For it is Bogina who is "boosting the level of generality" of *Mason's* disclosure "in order to wipe out" its effect under the FCA public disclosure bar. Upon full and fair review of *Mason's* disclosure, the Court concludes that the *Mason* Complaint publicly disclosed the allegations and transactions that Bogina alleges in this case. It is therefore necessary to assess whether Bogina is an "original source" of the information on which his allegations are based. *Leveski*, 719 F.3d at 829.

**B.   Bogina is Not an "Original Source" of the Information Alleged in his Complaint.**

As noted above, an original source "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," 31 U.S.C. § 3730(e)(4)(B), or under the pre-amendment version of the statute (effective before March 23, 2010), "has direct and independent knowledge of the information on which the allegations are based." *See Leveski*, 719 F.3d at 826 (quoting pre-amendment version of § 3730(e)(4)(B)); *Baltazar*, 635 F.3d at 869 ("The question is whether the relator is an original source of the allegations in the complaint and not, as the district court supposed, whether the relator is the source of the information in the published reports."). Bogina contends that he is such an "original source" because he "learned of the fraudulent conduct that he alleged through his own experience and investigation, completely independent of any public disclosures." Bogina Mem., Dkt. 85, at 21. Again, the argument rings hollow, where Bogina's opening salvo in the case was largely a carbon of the *Mason* Complaint. But even apart from the substantial degree to which Bogina has copied the allegations of the

*Mason* Complaint, Bogina's claim that he "learned of the fraudulent conduct that he alleged through his own experience and investigation" does not bear scrutiny.

According to his Complaint, Bogina's "experience" was as a former "business associate" of one of the defendant's deceased family members and an alleged party to the fraud, Michael Tutera, Compl., Dkt. 27, ¶¶ 14, 89; and Bogina's "investigation" was the procurement of "documentation pertaining to Defendants' illegal kickback inducement scheme" from Michael Tutera and his widow. *Id.* at ¶ 90. Moreover, although Bogina claims to have known Michael Tutera from as early as 1998 and to have been his "close confident," *id.* at ¶¶ 14, 90, and alleges that the Medline-Tutera fraud ran from at least 2003, *id.* at ¶ 89, Bogina nevertheless admits that he "learned" of the fraud much later—"from his conversations with Michael Tutera in 2008 and 2009"—eight years after Michael Tutera himself "agreed to sell his interest in the Tutera Group," in exchange for a "consultant" agreement whereby he "facilitated business deals involving the Tutera Group" "from time to time." *Id.* at ¶¶ 88, 95, 101, 103, 116, 126. And the documents and "Electronically Stored Information" Bogina procured from Michael Tutera's widow do not up the ante, since those came even later—after Michael Tutera's death in 2010— and with nothing other than the undefined "investigation" of Bogina's attorney to "supplement" them. *Id.* at ¶¶ 90-91. In this Court's view, these allegations demonstrate that Bogina's knowledge of the fraudulent scheme he alleges is not "direct" as required by required by the pre-amendment version of 31 U.S.C. § 3730(e)(4)(B), for his knowledge is, at best, secondhand. *See Glaser*, 570 F.3d at 921 (questioning whether relator could show direct knowledge of the information supporting her allegations where information "came from" her attorney).

While the Seventh Circuit declined to define the term "direct" explicitly in *Glaser*, the Court of Appeals nonetheless indicated that the term connotes "first-hand" knowledge, *id.* at 910

(the public disclosure bar encourages "lawsuits by relators who have firsthand knowledge of fraud against the government"); and being "personally aware of at least one instance of fraud," *id.* at 921, citing the Third Circuit's decision in *Paranich*, where the relator had "direct knowledge" of the fraudulent scheme he alleged "because he was ***involved*** in it." *See Paranich*, 396 F.3d at 336 (emphasis in original); *Glaser*, 570 F.3d at 919 ("The qui tam provisions of the FCA are designed to 'encourage persons with '***first-hand*** knowledge of fraudulent misconduct,' or those 'who are either ***close observers*** or ***otherwise involved*** in the fraudulent activity' to come forward.'" (emphasis in original) (quoting *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995)). The Seventh Circuit later provided similar guidance in *Leveski*, 719 F.3d at 839, with its citation to its earlier decision in *Lamers*, where the relator had "direct" knowledge of the fraudulent activity he alleged because he observed it "***firsthand***." *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1016-17 (7th Cir. 1999) (emphasis added). Other courts in this district have similarly construed section 3730(e)(4)(B)'s requirement of "direct" knowledge to mean "personal" or "firsthand" knowledge.[13]

Bogina's conversations with Michael Tutera and procurement of documents from Tutera and his widow fall far short of such personal and firsthand involvement. Nor do they meet any of the other definitions of "direct" noted with approval (though not formally adopted by the Court of Appeals) in *Glaser*: "marked by ***absence of an intervening agency***, instrumentality, or influence: ***immediate***"; "unmediated by anything but the [relator's] own labor"; and "[b]y the relator's own efforts, and not by the labors of others, and . . . ***not derivative of the information of***

---

[13] *See*, *e.g.*, *Bannon*, 406 F. Supp. 2d at 923 (relator not an original source because "Personal knowledge cannot be reasonably inferred."); *United States ex rel. Grant v. Rush-Presbyterian/St. Luke's Med. Ctr.*, No. 99 C 06313, 2001 WL 40807, *5 (N.D. Ill. Jan. 16, 2001) ("To have 'direct and independent' knowledge of the alleged fraud, [relator] must have first-hand, personal-knowledge of the alleged wrongdoing, gained independent of the public disclosure of the wrongdoing.").

*others*." *Glaser*, 570 F.3d at 921 n.8 (citing cases) (emphasis added). But even more telling than Bogina's attenuated knowledge of the scheme he alleges are all of the other attributes of an "original source" that he lacks, by comparison to the relator in his chief authority on the point, *Leveski*. *See* Bogina Mem., Dkt. 85, at 20-22 (citing *Leveski*).

Unlike Bogina, the *Leveski* relator was a former employee of the defendant she sued, ITT, and a "decade-long" employee to boot. *Leveski*, 719 F.3d at 829-30. She alleged that "ITT knowingly submitted false claims to the Department of Education in order to receive funding from the federal student financial assistance programs." *Id.* at 819. Because other relators had already alleged certain false claims by ITT in earlier litigation in another district, the *Leveski* court examined the key differences between the *Leveski* relator (and her claims and evidence) and the earlier relators (and their claims and evidence): (1) "because Leveski worked at ITT for so much longer than the [earlier] relators, she [had] greater potential than the [earlier] relators to possess relevant evidence about ITT's compensation scheme"; (2) "the long span of Leveski's employment allow[ed] her to make allegations against ITT that cover a different time period than the [earlier] relators"; (3) "because the [earlier] relators were employed by ITT for a relatively short period of time, they were only able to make allegations about the one department to which they were briefly exposed," whereas Leveski was "able to present evidence about ITT practices in a second department . . . since her long employment afforded her the opportunity to hold two different positions"; (4) Leveski alleged a different means of violating Department of Education requirements that was "much more sophisticated—and more difficult to detect"; and (5) "virtually all of Leveski's evidence in support of her allegations [came] from conversations to which she was a party." *Leveski*, 719 F.3d at 829-31, 837.

Bogina brings none of these benefits to this case—unlike both Leveski and the prior relator concerning the very same scheme alleged here, Mason. Bogina was never employed by any of the defendants in this case, unlike Mason who alleged he was employed by Medline for nearly seven years and held two different positions during that time. Medline Mem. Ex. B, Dkt. 65-2, ¶ 21. The scheme Bogina alleges falls within the timeframe Mason alleged (2003-2009, *see id.* at ¶¶ 216, 220-498);[14] involves the same conduct Mason alleged ("bribes," "rebates," and "kickbacks" to induce purchases from Medline, resulting in false claims to Medicare and Medicaid); and accuses the same actors Mason accused (nursing facilities and their related entities, purchasing officials, and others who influence their purchasing decisions, and the Medline Healthcare Company sales department that services them). *Compare* Dkt. 1, ¶¶ 1-12, 26-50, *and* Compl., Dkt. 27, ¶¶ 77-78, 89, *with* Medline Mem. Ex. B, Dkt. 65-2, ¶¶ 1-14, 26-53. And Bogina does not claim he was personally involved in any of this activity or observed it firsthand, unlike Mason who alleged he "was responsible for administering Medline's 'rebate' program, and thereby gained personal knowledge of the timing, amount, and value of purchases and inducements" for Medline's various customers. Medline Mem. Ex. B, Dkt. 65-2, ¶ 21.

Rather, Bogina alleges that he "learned," "engaged in and/or witnessed" communications and information regarding the fraud he alleges through conversations with a now-deceased witness (Michael Tutera) and documents provided by him and his widow, "as supplemented by"

---

[14] Here again, Bogina's resort to pleading "on information and belief" as to the period after 2009 poses problems under the statute. The amended version of § 3730(e)(4)(B), which applies to conduct after March 22, 2010, requires an "original source" to have "knowledge that is ***independent of and materially adds to*** the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B) (emphasis added). Bogina's bare allegation "on information and belief" that the fraud alleged "continues to the present day," Compl., Dkt. 27, ¶¶ 89, 135, plainly fails to meet this standard. Bogina's "original source" status thus turns on whether he has "direct and independent knowledge," as required by the pre-amendment version of the statute, of the fraud he alleges between 2003 and 2009. *See id.* at ¶ 89.

the "investigation," otherwise undescribed, of Bogina's attorney. Compl., Dkt. 27, ¶¶ 14, 91. This is not "direct" knowledge as required by 31 U.S.C. § 3730(e)(4)(B), because Bogina was not "involved" in the conduct, *Paranich*, 396 F.3d at 336, did not witness it "firsthand," *Lamers*, 168 F.3d at 1017, and is not "personally aware" of it. *Glaser*, 570 F.3d at 921. And since the burden on the issue is Bogina's to carry, *Absher*, 764 F.3d at 707; *Glaser*, 570 F.3d at 922 (relator "has the burden of proving the jurisdictional facts"), the Court cannot reasonably infer such direct knowledge on his behalf.

## IV.     Dismissal and Supplemental Jurisdiction

Because Bogina is not an "original source" of the information on which his allegations are based, the public disclosure bar of 31 U.S.C. § 3730(e)(4) requires dismissal of Bogina's FCA claims (Counts I-III). Medline and Tutera ask that dismissal be "with prejudice." *See* Tutera Reply, Dkt. 88, at 8 ("The Court lacks subject matter jurisdiction over this case, and Relator's Complaint must be dismissed with prejudice."); Medline Reply, Dkt. 87, at 14-15 ("Bogina's federal claims should be dismissed for lack of jurisdiction and . . . . with prejudice."). But this dismissal is required by the pre-amendment version of § 3730(e)(4)'s public disclosure bar (effective before March 23, 2010), which governs all of Bogina's FCA claims except for two paragraphs in his Complaint alleging on "information and belief" that the scheme described in other paragraphs "continues to the present day." *See* Complaint, Dkt. 27, ¶¶ 89, 135. The Seventh Circuit has stated that this pre-amendment version of the FCA's public disclosure bar is "a jurisdictional requirement that must be addressed before a court can reach the merits of the FCA claims." *Absher*, 764 F.3d at 705-06 and n.8 (citing *Rockwell*, 549 U.S. at 467-70: "*Rockwell* made clear that § 3730(e)(4) must be addressed before a court can reach the merits of the underlying FCA claims."). Any dismissal for lack of federal jurisdiction based on that

version of the public disclosure bar (effective before March 23, 2010) therefore must be without prejudice.[15]

This is not to suggest, however, that this dismissal "invites amendment," as it is nevertheless "a conclusive jurisdictional ruling." *See Bovee*, 732 F.3d at 743-44. Bogina may not amend and refile his claim in federal court. *Id*. And to the extent the amended version of § 3730(e)(4) is not "jurisdictional,"[16] and dismissal of the sliver of Bogina's Complaint governed by that amended version of the FCA's public disclosure bar (*see supra* note 14) is therefore a merits determination, further amendment by Bogina would be futile, in any event. As Medline and Tutera assert, Bogina's current Complaint "represents his fourth attempt to state a claim adequately," and "there is no reason to believe that any future attempt would be less futile." *See* Medline Reply, Dkt. 87, at 14-15; Tutera Mem., Dkt. 62, at 22; Tutera Reply, Dkt. 88, at 15; *see also Bannon*, 406 F. Supp. 2d at 927 (dismissing "relator's fourth go at it" with prejudice).

Medline and Tutera also urge the Court to "decline to exercise supplemental jurisdiction" over Bogina's state law claims and to dismiss those claims with prejudice. *See* Medline Reply,

---

[15] *See Bovee v. Broom*, 732 F.3d 743 (7th Cir. 2013) ("A dismissal for lack of federal jurisdiction is without prejudice"); *Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004) ("A suit dismissed for lack of jurisdiction cannot *also* be dismissed 'with prejudice'; that's a disposition on the merits, which only a court with jurisdiction may render.").

[16] Although the Seventh Circuit has not directly addressed the jurisdictional impact of the 2010 amendment of § 3730(e)(4), it has questioned whether the amended version is jurisdiction-stripping, *see Absher*, 764 F.3d at 705-06 (noting that "it is no longer clear" that the amended version "is a jurisdictional requirement"), and other courts have concluded that the amended version "creates grounds for dismissal for failure to state a claim rather than for lack of jurisdiction." *See United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810-11 (11th Cir. 2015) (citing cases). If so, dismissal of Bogina's two "information and belief" paragraphs under the amended version of § 3730(e)(4) would be a merits determination, *see Yassan v. J.P. Morgan Chase and Co.*, 708 F.3d 963, n.1 (7th Cir. 2013) (dismissal under Rule 12(b)(6) addressed the merits), assuming those two paragraphs substantial enough to invoke federal jurisdiction. *See Carr v. Tillery*, 591 F.3d 909, 917 (7th Cir. 2010) (the "presumption" is that dismissal of a claim "should be on the merits," rather than because it failed "to engage federal jurisdiction").

Dkt. 87, at 14-15; Tutera Mem., Dkt. 62, at 28, 30.[17] To the extent the Court's dismissal is for lack of subject matter jurisdiction, no supplemental jurisdiction exists;[18] and to the extent the dismissal is on the merits, supplemental jurisdiction should not be exercised,[19] and the Court declines to do so. In either case, the dismissal of Bogina's state law claims (Counts IV-XIV) also must be without prejudice.[20]

For all of these reasons, the Court grants Medline's and Tutera's motions to dismiss, Dkts. 61 and 64, and Bogina's Third Amended Complaint is dismissed in its entirety.


Date: March 24, 2015

_____
John J. Tharp, Jr.
United States District Judge

---

[17] Although Bogina's Complaint alleges jurisdiction over his state claims under 31 U.S.C. § 3732(b), Dkt. 27, ¶ 9, his Response bases supplemental jurisdiction on 28 U.S.C. § 1367. *See* Dkt. 85, at 43-44. But since § 3732(b) creates "a form of supplemental jurisdiction," *Wisconsin v. Amgen, Inc.*, 516 F.3d 530, 532 (7th Cir. 2008), the outcome under both is the same.

[18] *El v. Americredit Fin. Servs., Inc.*, 710 F.3d 748, 753 (7th Cir. 2013) (supplemental jurisdiction "is limited to claims intimately related to claims that are within federal jurisdiction on some ground"); *Miller v. Herman*, 600 F.3d 726, 730 (7th Cir. 2010) (when district court lacks subject matter jurisdiction, it is "unable to exercise supplemental jurisdiction" and must dismiss the entire complaint); *Rifkin v. Bear Stearns & Co.*, 248 F.3d 628, 634 (7th Cir. 2001) ("The district court is empowered to take supplemental jurisdiction over state claims only if the court first has 'original jurisdiction' of the claim to which the state claims are attached.").

[19] *See RWJ Mgmt. Co. v. BP Prods. North Am., Inc.*, 672 F. 3d 476, 479 (7th Cir. 2012) ("presumption" is that court will relinquish supplemental jurisdiction over state law claims when federal claims are dismissed); *Wilson v. Price*, 624 F.3d 389, 395 (7th Cir. 2010) ("Because the federal claims were properly dismissed, it was also appropriate for the district court to dismiss the pendent state law claims in the absence of any independent basis for federal jurisdiction.") (citing *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003)).

[20] *See Americredit*, 710 F.3d at 753 (where original claim lacked subject matter jurisdiction, counterclaim lacked supplemental jurisdiction and should have been dismissed without prejudice); *Harvey v. Town of Merrillville*, 649 F.3d 526, 532-33 (7th Cir. 2011) (once district court declines to exercise supplemental jurisdiction over state claims, "proper course" is to dismiss them without prejudice).